Good morning. Welcome to the United States Court of Appeals for the Sixth Circuit. Judge Strange and I are very pleased this morning to be joined by the Honorable Pam Reeves, United States District Judge for the Eastern District of Tennessee. Without district judges who are willing to give their time to help us with our document, we cannot function as we do and we're very pleased to be Thank you. With that, I'll remind the appellants that if you want to reserve some time for rebuttal, it's helpful to us if you tell us that at the beginning of the argument, even if you've already worked it out with the clerk. And with that, the court may call the first case. Good morning, Your Honors. My name is Robert Campadel. I represent Stolle Machinery Company and with me is at counsel table is Audrey Kwok, who is also co-counsel for Stolle Machinery Company. Your Honors, we've reserved three minutes of rebuttal time for our argument. Your Honor, the issue in this case is whether based on the complete record, which shows the existence of genuine issues of material fact with regard to Appellant Stolle's claims for misappropriation of trade secrets, the district court improperly granted summary judgment dismissing the misappropriation of trade secret claim based upon the four-year statute of limitations under the Ohio Uniform Trade Secrets Act, which incorporates the discovery rule. Stolle believes that the district court did improperly grant summary judgment against Stolle, even though there existed genuine issues of material fact, by improperly drawing factual references against Stolle and in favor of the defendants, the moving parties here. The court should have drawn the factual inferences in favor of Stolle, the non-moving party, and denied summary judgment in this case and allowed the case to go to trial. And Your Honors, while there are other counts in the complaint and that issue, I would like to focus mainly on the statute of limitations issue for misappropriation of trade secrets. That's the main thrust of our claim and I believe that's what most of our briefs and the documents here. And while the facts and the procedure and the technology is somewhat complex, I believe that our argument is not. Our complaint was filed in 2010, April of 2010. The court found here that the statute of limitations began to run in 2003, which is seven years before the complaint was filed. However, the evidence of record shows that Stolle did not have sufficient knowledge in 2003 to file its complaint or responsibly file its complaint and actually did not discover or had reason to know of the trade secret misappropriation by defendants until late 2006, early 2007, at the earliest. How do you distinguish the emails that seem to indicate an understanding that he had all the drawings, he had taken everything? There was one email of record from a Mr. Gary, who was a sales representative in China of Stolle. And, you know, the facts here were difficult to discover because Mr. Xu An, who was a Chinese national, came to the United States, worked for Stolle for 10 years, went to the University of Cincinnati, then went back to China and took all the evidence with him back to China. But, I'm sorry, if I can get to that email, Mr. Gary didn't have any hard evidence, any documentary evidence. All he had were rumors and possible boasts. Rumors heard from third parties, boasts from other parties, that Mr. An had drawings of Stolle from which he could manufacture equipment extremely similar or as good as Stolle's. So, Mr. Gary, being a sales representative, was obviously upset and obviously concerned. However, he had no hard evidence and under the law that's applicable to these cases, his suspicions and concerns are not enough. Well, wouldn't, under the discovery rule, you know, obviously Stolle had concerns, had some evidence that Mr. An had taken drawings that would constitute trade secrets with him. There's not any issue about Mr., I believe his last name is Mr. Butcher, isn't it? Gary would be his first name, isn't it? Bob Gary was the sales representative. Mr. Butcher was the president of Stolle to whom Mr. Gary had written the email. Okay. Yeah. So, there's not, there can't be any issue about the Stolle principal's awareness of what had happened. Well, the Stolle's principal was aware of what Mr. Gary told him about, again, suspicions and concerns. And he sent an email to suppliers, correct? He sent a letter to suppliers saying that Stolle has heard. And I think the big difference here, Your Honor, is that Stolle's trade secret drawings are mainly four different types, two of which aren't trade secrets. They're drawings that are given out. After Mr. Gary had heard about Mr. An's statements, Stolle was given some drawings, a smattering of drawings, but these drawings were not trade secret drawings. Well, the point I'm ultimately getting to is this. Clearly, there was some information that Stolle had as early as 2003. What would be the evidence of diligence and efforts that Stolle pursued close to that time in order to ascertain further whether it had a cause of action? Again, Your Honor, Stolle's obligation, after it had suspicions and concerns, was to conduct a reasonable investigation. And when you look at what is a reasonable investigation, you have to consider everything was in China. I want to know what Stolle did. I'm not asking you what the legal requirement is. I'm asking you what facts in the record would tend to allow the beginning of the running of the statute of limitations to occur at a later time. Well, Stolle wrote, Stolle sent the letter to its suppliers. That's about the only source of information it could use or seek. So it sent letters to its suppliers saying Mr. Xuan is making these statements. Okay, we know that. We're talking about after that. This is advancing the answer to the question. After that, Stolle reviewed whatever information it had. Stolle couldn't go to China. There's no discovery in China. You can't do depositions in China. So Stolle tried to contact as many third-party sources as it could. Where would we look at the evidence of that in the record, and what's the time frame? Well, that was Mr. Butcher's letter, Your Honor. Mr. Butcher's letter was sent out to all of those persons. There's no additional evidence in the record of that? No, no, Your Honor. There's no additional evidence in the record of that. But as a result of that, Stolle received a letter from Mr. An's counsel indicating that we were defaming, or Stolle was defaming Mr. An. And given that letter, given the fact that by saying you're defaming Mr. An, that you're not saying what is true, that you're telling untruths about Mr. An that are of a defamatory nature, Stolle backed off on that and did what it could. But it couldn't go to China, couldn't get the drawings in China. It only had whatever information it could obtain. And then it went to the FBI and asked the FBI to investigate because even if you take non-trade secret drawings, that couldn't be a conversion. Stolle was concerned about that. So it exhausted all of its resources that it reasonably could. And I think you have to really look at what was reasonable under these circumstances to determine whether Stolle met its obligation to conduct a reasonable investigation. Under the circumstances, we strongly believe it did. Would you turn to the SLAC issue? It seems to me that there might be a timing distinction between the 2003 discovery by An and the use or discovery by SLAC at a different date. Yes, Your Honor. SLAC, what was that? It's replete in the record that SLAC was incorporated in 2004, early 2004. None of the documents of Stolle mention SLAC. Stolle doesn't know of SLAC. There's no evidence of record with regard to the existence of SLAC. So the statute can't run with regard to another party that commits trade secret misappropriation if you don't have knowledge of that party or its activities. What do you say the trigger date is for SLAC? 2006, Your Honor, late 2006, early 2007, when Stolle became aware of a sale in the United States by SLAC through a company called Alphonse Haar, who was another supplier to a company called Simmons Pet Food in Arkansas. Stolle, it's a small industry, and Stolle was provided with products from that machine in Arkansas that represent these canned ends that have the pop top to it, but they're just purely canned ends. When Stolle saw those canned ends, Stolle knew or had good cause to know that Mr. Haar and or SLAC, Stolle became familiar with SLAC through that particular machine because it had a SLAC nameplate on it. There was a magazine article that referred to SLAC, and that's when Stolle first became aware. What's the precise date for the time that Stolle got these canned ends and so on and so forth? We have a bill of lading showing that that machine, it's in the record, was delivered in September of 2009. Therefore, they couldn't have gotten the canned ends until after September, I'm sorry, 2006. I misspoke. That's why it becomes important. It becomes important to peg the precise date in 2006. I would say at the earliest, Stolle became aware after the delivery of the machine in September of 2006. The machine had to take a little bit of time to get up and get running to be able to produce those, so it had to be towards the end of 2006. We don't have a precise date, but the landmark date would be September of 2006 after the machine was delivered. Clearly not before April 22nd, 2006, which is the four-year mark from the debt to the date suits. Right. If you find that Stolle's first knowledge of SLAC and misappropriation of trade secrets was in 2006, Stolle would have, September of 2006, Stolle would have filed its action within the four-year statute of limitations. We understand the point, and unless there are further questions at this point, you'll have your rebuttal time. I thank you very much, Your Honor. Ms. Black. Thank you, Your Honors. David Black, on behalf of the Appalese, the Shuzo SLAC Precision Equipment Company, and one of its founders, Mr. Hsu An. With me today at council table is April Bessel, co-counsel, who had a large hand in writing and drafting our brief. We're here today to ask the court to affirm the lower court's decision, Judge Walter Rice's decision, which granted summary judgment. Like Mr. Campadel, I will limit my discussion with you today about the misappropriation of trade secret claim and the court's decision to dismiss that claim based on the four-year statute of limitations. That seems to be the overriding focus of their appeal. What do you say is the evidence in the record of when Stolle learned about the existence of SLAC? Well, Your Honors, we rely on the evidence that is undisputed. We rely upon evidence that comes from, one, Greg Butcher, the chief operating officer of Stolle. We rely upon the e-mails from that company. We rely upon letters and correspondence and other documents that were filed. Particularly, the court has already made reference to an e-mail from Robert Geary. Mr. Geary is a sales rep, as Mr. Campadel indicates. That's not about SLAC. I'm sorry? My question is about SLAC. Oh, I'm sorry. When does the, what evidence in the record establishes when Stolle became aware of the existence and activities of SLAC? Your Honor, in this particular case, with respect to SLAC, it is true that SLAC was formed in 2004. We don't dispute the fact that it became a corporation at that time and it's since evolved and has grown larger and is a competitor now on the same scale as the appellant Stolle. But SLAC, if you look at when the statute begins to run for SLAC, it's the Sixth Circuit's position that any claim for misappropriation starts when the items are misappropriated for the first time. The Sixth Circuit has said in this amalgamate... Your claim is that SLAC acquired trade secrets from ON. Correct? That's not our claim. No, in fact, we do not, in fact, we vehemently dispute that my client, the SLAC Precision Equipment Company, stole or took or misappropriated any trade secrets whatsoever. We dispute that. But that is not necessary for the Court's determination today as to whether or not the statute of limitation bars the appellant's claim. But the appellant's claim seems to me to be divided into two categories. It is the claim for the activities of Mr. ON and it's the claim for the actions of SLAC. Is it your position that if Mr. ON acquired something inappropriately, let's assume, inappropriately in 2003, there can be allegations that he used it or that then a completely different entity acquired it at a later date and stole it and is out of luck against that second acquiring entity? Yes, Your Honor. In fact, the case law tells us in the Sixth Circuit that misappropriation arises only once, only one time when those documents or information is actually taken, usurped, controlled, exercised. The fact that a company comes into existence a year, two years, ten years down the road doesn't automatically restart the statute of limitations argument. Is there an issue with whether it's the same person or entity using what has been improperly taken across time versus those misappropriated secrets being provided to a completely separate entity at a later date? Your Honor, the case here is that the allegations are that ON is the one who misappropriated these trade secrets, not SLAC, and that ON then gave them to SLAC to use in the SLAC business. That's been the allegation. Our point is that you don't need to look at ON's companies, what these companies did down the road, because that doesn't restart the statute of limitations. For example, if ON started a company tomorrow, that wouldn't start the statute of limitations again for that new entity or new company. The misappropriation took place back in 2003 when Mr. ON worked for the Stahli Company. That's when the allegations are set out that this occurred. You can't just restart the statute of limitations every time there's a new company or new entity. Again, you would never have any type of finality with statute of limitations. Every time there's a new company, new entity, new use, that would be a new situation where there's misappropriation, and you would never have a statute of limitations case. Does that matter whether it's the misappropriated drawings versus the misappropriated and subsequent use of customer lists or other secrets that are different? We think this is a different case, Your Honor. In fact, here we're talking about drawings which the appellants claim are proprietary type drawings, and they're claiming that this information has a trade secret type value, and that they've taken steps to protect that. And for purposes of this case, we've not taken issue with that. We've not disputed that. We're saying that that's their claim. Our argument is that they knew or had a reasonable belief that we had taken this information back in 2003 based on the emails, the correspondence, the information that the court has referred to already that indicate that they had a reasonable belief and a firm belief that my clients had this information. Well, I guess I'm struggling, and I would like you to educate me on what you mean by this information. If this information is they knew in 2003 that he had taken drawings and was using drawings, is there a separate discovery issue if they found out in 2007 that he had also taken customer lists? Or something that is different, and they discover it at that time because it is being used by another entity? I understand the question, Your Honor, and I would say that it's no different and that the statute starts to run on the first act of misappropriation. The analogy that I use, it's sort of like the homeowner who suffers a break-in. The robber comes in and they steal the silver, and all the fine silver, and they try to prosecute the claim. They decide not to charge the burglar, but then later they realize, oh, not only did the burglar take the silver, he took the gold as well. Well, you know, it's hard to go back and then try to recreate that incident and try to prosecute or sue for that injury when it occurred back on the very first date. There wasn't another date where the robber took the gold. It was the same date that he took the silver. That's when the misappropriation occurred. Does the law in misappropriation of trade secrets support that based on its discovery rule? Your Honor, again, the misappropriation case that I'm referring to is the Amalgamated Industries case v. Teresa, Inc., 6th Circuit, 2003, which that court takes the view that misappropriation of trade secrets, where that is a, each time you use something, it becomes a new tort, a new action. That's really, I mean, what we're talking about here is the party, the entity that is being sued, and, you know, so it's really, I mean, I'm not sure that we're talking about exactly the same thing when we're talking about the running of a limitations period. I mean, clearly you can't take action against someone until it exists, and if the thief of the trade secrets creates other corporate entities of which you're unaware, it's not like the thief who stole more than you thought. It's not the same party. It's another entity, and until you had knowledge of that entity's involvement in the theft, existence, and involvement in the theft, or involved in the use of the stolen property, you wouldn't have a reason to proceed against that entity. And let me address that two ways, Your Honor. First off, with respect to this analogy of the thief taking the silver, then you find out later about the gold. If that thief started... Not the property you're focusing on. You've got the same thief in that case. You have the homeowner, what property the thief took. In here, you have a situation in the analogy that there is a new company, that the thief is now in the business of selling stolen property. That he has the stolen property. Now the thief has a business to sell the stolen property. Well, under the civil theories that we have here today, you don't look at when the thief started to sell the property. You look at when the thief stole the property, when he actually stole it for the first time. Yeah, but you don't get whether the business that bought it from him acquired with knowledge stolen property. Because that's a separate crime. And that may be a separate crime. That may be a separate crime. Yeah, so that's the question here. And again, if we can go back to Mr. Onn, you know, it's our position that the appellant should have taken action four years after 2003, based on the knowledge that they had. I mean, Mr. Onn was just one of the founders of the Shuzo Slack Precision Equipment Company. And that company was in existence as of early 2004. The undisputed evidence is that the appellant knew of the existence that Mr. Onn had a company. That's in the emails that we've seen in the record. But the information that Stolle had was a different company. A company called Anchor. That's correct, Your Honor. But under due diligence, they could have realized this is a matter of public record. There's no dispute here that we were trying to hide the company formation or that there's somehow a secretive process. This was a public record, this company, as of 2004. If they knew we had a company in late... Can I shift gears a little bit with you? Yes. What would constitute due diligence under the particular circumstances of this case? I mean, the same kind of investigation that would be available to a wronged party in the United States clearly would not be available to the injured party if the thief was in China. And, Your Honor, in this case... Because China is national. So what would be diligence? In this case, Your Honor, with respect to Mr. Onn, he's also a U.S. citizen. He came here in the 1990s to go to school and became a U.S. citizen. In fact, when these out... He's forming corporate entities not in America. That is correct. The question is, how does it help that he's a U.S. citizen? What more can they do because he's a U.S. citizen that... I mean, he's not in the United States, not operating in the United States, to their knowledge. What's the... What does that say? Well, Your Honor, again, Mr. Onn does have, you know, citizenships in the U.S. He had a one-time property in the U.S. In fact, when this dispute arose in 2003 and 2004, he hired a lawyer in Sydney, Ohio, which is right next door to the Stolle Company headquarters, an Ohio lawyer, to dispute the allegations and to tell the appellants to cease and desist. That doesn't answer the question. The question is, what could Stolle have done with corporate entities by whatever form or name they are formed in China? What could Stolle have done to figure out what Onn is doing in China? Well, the first thing, Your Honor, they could have done is to bring an action against Xu An individually. And I was sort of assuming that that would be their first step. I mean, they sent correspondents to their suppliers saying, hey, this guy's engaged in... I'm sorry. Bring a cause of action in China against Onn. No, Your Honor. No, Your Honor. Bring a cause of action here in the United States, just like they've done today. I mean, they brought this lawsuit, this lawsuit that we're here for. They brought this lawsuit in Ohio, a lawsuit against Onn and a lawsuit against Slack. Their judgment was that they did not have sufficient evidence to go forward at that time. You know, there's been a lot of effort in recent years in particular to prevent the filing of complaints that are based on, that are just based on supposition, changes in the law, changes in the rules. You know, we don't want parties filing lawsuits in order to fish. We want parties to have some basis for filing the lawsuit. So you're suggesting that despite their judgment, they did not have enough evidence to proceed. They should have proceeded anyway. Well, Your Honor, my contention is that... I'd like to see us get Mr. Onn before the court in that United States file lawsuit, but... Well, Your Honor, let me go back in time, back to 2003. And again, the standard was different. There was no Iqbal and Twomley standard. It was a notice pleading standard. And the appellants believed they actually had enough evidence with which to bring a lawsuit. Again, they eventually did that without any more evidence other than looking at a machine that my client had refurbished. And again, if we look at some of these emails from Robert Gehry, they talk about, you know, this guy having all the drawings. A quote from that Gehry email, it says, sounds like he has all the drawings. All the drawings. I think that would be a good faith basis to pursue a lawsuit against Mr. Onn. And likewise... They're not against slack if they didn't exist. They didn't exist at the time, but they would exist just a few months later. A few months later, this company came into existence, shortly after that email. And again, in a letter in December of 2003, again, right before Slack's formation, just a few months before, they write a letter to their suppliers. And again, just a few sentences from this letter to the suppliers. And it says here, Your Honor, Stolle has learned through reliable sources that Mr. Onn is using, manufacturing and selling Stolle post-repair conversion equipment, tab and laying die tooling in China. It would be remarkable for Mr. Onn to have developed his own line of machinery, which we have heard is identical to Stolle machinery, in six months since leaving the employment of Stolle, without utilizing Stolle's trade secret and confidential information. So here's what they're concluding. Here's what they're telling everybody. Our point is that Stolle made a conscious decision not to sue Mr. Onn. He was not a threat at this time. They let it go. They made a conscious decision to let it go and see how it went. Slack was formed just a few months later, had the exercise due diligence. They could have tried to, you know, remedy this perceived wrong. I see I'm out of time, Your Honors. I need a few questions. Your Honor, just a few points in rebuttal. Mr. Black discussed the letter from Mr. Butcher, but the letter was the start of the investigation. Mr. Butcher laid out his suspicions and concerns and asked for information with regard to those suspicions and concerns, and the post-investigation information wasn't sufficient enough to start a lawsuit. Stolle had no cause to even investigate Slack back in 2003 or 2004, 2005, until 2006 when it became aware of Slack. So, you know, to say it's a matter of public record, when you don't know of a company, you have no cause to investigate that company. The record has ... Is there even a public record in general that's accessible for their corporate entities? I don't know at that time, Your Honor. I mean, from the United States, with the Internet, I don't believe that you could get that information. So I think the information was not reasonably accessible. You don't know, do you? But I don't know, Your Honor. I don't know at that time what ... Stolle didn't do anything to seek to find out that kind of information. We have no evidence that Stolle did a corporate search of Mr. Schuon to determine whether he owned any other companies, because it thought his company was Suzhou Anchor, or Anchor, which is reflected in Mr. Butcher's letter. But again, with regard to evidence of Slack, on page 63 of Mr. Butcher's deposition, which is docket number 72, I can't remember the exact page docket number, but it's page 63 of his deposition, he was specifically asked by Mr. Black, when did you first become aware of Slack? And Mr. Butcher's answer was, I said, when I became aware of the Simmons Pet Food machine, the sale by Slack to Simmons Pet Food in Arkansas. So that's in the record several times, I believe, but I recall that it's on page 63 of his deposition. And with regard to the statute of limitations applying to a third party, you can have statute of limitations for misappropriation of trade secrets begin to run on different dates with regard to different parties, depending on the facts. And that's a genuine issue of material fact here. When did it run against Slack? When did Stolle discover Slack? What did Stolle know back in 2003? And we cited the USM versus Tremco case to say that, in our brief, to say, which states and holds that the statute of limitations can run at different times with regard to different parties for essentially the same trade secrets. And the Ohio statute allows that as well. And I thank you very much, Your Honor. No further questions. Your time is up. We appreciate the argument that both of you have given and will consider the case carefully. Thank you.